**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

MDL No. 2841
Master File No. 18-MD-02841-GAYLES

IN RE:

**MONAT HAIR CARE PRODUCTS MARKETING,**
**SALES PRACTICES, AND PRODUCTS LIABILITY**
**LITIGATION**
_____

THIS DOCUMENT RELATES TO THE
CONSOLIDATED CLASS ACTION CASES

_____/

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS FIRST AMENDED**
**MASTER CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

ALLEGATIONS ASSUMED TO BE TRUE .............................................................. 4

    I.      Generally .................................................................................................. 4

    II.     Defendants .............................................................................................. 5

    III.    Plaintiffs' Use of Monat's Products and Alleged Injuries ....................... 5

    IV.    Defendants' Marketing Representations ................................................. 7

    V.     Defendants' Alleged Misconduct .......................................................... 7

APPLICABLE STANDARDS ....................................................................................... 9

    I.      Federal Rule of Civil Procedure 12(b)(6) Applies to Counts II–X ........................ 9

    II.     Federal Rule of Civil Procedure 9(b) Applies to Plaintiffs' State Consumer Protection and Unfair Trade Practices Act Claims (Counts I, XI-XXV) Because they Sound in Fraud .............................................................. 10

ARGUMENT ............................................................................................................. 11

    I.      PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THEY FAIL TO SUFFICIENTLY PLEAD THE EXISTENCE OF A PRODUCT DEFECT AND CAUSATION OF INJURY ......................................................... 11

          A.    Plaintiffs' Product Liability, Negligence, Failure to Warn, Unjust Enrichment, and Breach of Express and Implied Warranty Claims Should be Dismissed Because Plaintiffs Fail to Plausibly Allege that Monat's Products are Defective (Fed. R. Civ. P. 12(b)(6)) ................ 12

          B.    Plaintiffs' FDUTPA and Other Consumer Claims Suffer From the Same Fatal Infirmity—Failure to Sufficiently Allege a Product Defect ............................................................................................. 19

          C.    Plaintiffs' Claims Should be Dismissed Because they Fail to Sufficiently Allege that Monat's Products Cause Bodily Harm (Fed. R. Civ. P. 12(b)(6) and 9(b)) .......................................................... 21

    II.     PLAINTIFFS LACK STANDING TO ASSERT CLAIMS FOR INJUNCTIVE RELIEF (FED. R. CIV. P. 12(b)(1)) ............................................ 29

    III.    PLAINTIFFS' CLAIM FOR UNJUST ENRICHMENT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD LACK OF AN ADEQUATE LEGAL REMEDY (COUNT VIII) ............................................. 31

    IV.    PLAINTIFFS FAIL TO ALLEGE SUFFICIENT FACTS RELATING TO B&R UNDER FDUTPA AND THE STATE CONSUMER CLAIMS (FED. R. CIV. P. 9(b)) ............................................................................... 32

**V.**   SEVERAL OF PLAINTIFFS' STATE DECEPTIVE TRADE PRACTICE AND CONSUMER PROTECTION CLAIMS ARE BARRED BY APPLICABLE STATUTES OF LIMITATIONS ................................................. 33

    A.   Claim Subject to a One-Year Statute of Limitations ................................ 34

    B.   Claims Subject to a Two-Year Statute of Limitations ............................. 34

    C.   Claims Subject to a Three-Year Statute of Limitations ........................... 35

CONCLUSION ...................................................................................................................... 36

# TABLE OF AUTHORITIES

Page

Cases

*Altman v. HO Sports Co., Inc.,*
2009 WL 4163512 (E.D.Cal. Nov. 23, 2009) ........................................................ 18

*Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.,*
390 F. Supp. 2d 1170 (M.D. Fla. 2005) ................................................................ 31

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .......................................................................................... 9, 16, 19

*Barrow v. Bristol–Myers Squibb,*
1998 WL 812318 (M.D. Fla. 1998) ...................................................................... 22

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................ 19, 26

*Berry v. Indianapolis Life Ins. Co.,*
608 F. Supp. 2d 785 (N.D. Tex. 2009) ................................................................ 11

*Beshears v. Provident Life & Acc. Ins. Co.,*
2007 WL 1438738 (D. Ariz. May 15, 2007) ........................................................ 10

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ............................................................................................ 30

*Bowleg v. Bowe,*
502 So.2d 71 (Fla. 3d DCA 1987) ...................................................................... 31

*Brooks v. Blue Cross and Blue Shield of Fla., Inc.,*
116 F.3d 1364 (11th Cir. 1997) .......................................................................... 8

*Camasta v. Jos. A. Bank Clothiers, Inc.,*
761 F.3d 732 (7th Cir. 2014) .............................................................................. 10

*Cheatham v. ADT Corp.,*
161 F. Supp. 3d 815 (D. Ariz. 2016) .................................................................. 34

*Dapeer v. Neutrogena Corp.,*
95 F. Supp. 3d 1366 (S.D. Fla. 2015) ................................................................ 29, 30

*Davila v. Delta Air Lines, Inc.,*
326 F.3d 1183 (11th Cir. 2003) .......................................................................... 9, 17, 23

*Dixon v. Allergan USA, Inc.*,
    645 Fed. Appx. 930 (11th Cir. 2016).................................................................... 20

*Duty Free Americas, Inc. v. Estee Lauder Cos.*,
    797 F.3d 1248 (11th Cir. 2015) ......................................................................... 29

*Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*,
    673 Fed. Appx. 925 (11th Cir. 2016)..................................................................... 28

*Elfaridi v. Mercedes-Benz USA, LLC*,
    2018 WL 4071155 (E.D. Mo. Aug. 27, 2018) ...................................................... 10-11

*Frenzel v. AliphCom*,
    76 F. Supp. 3d 999 (N.D. Cal. 2014) .................................................................. 10

*Gomez v. Pfizer, Inc.*,
    675 F. Supp. 2d 1159 (S.D. Fla. 2009) ................................................................. 18

*Greer v. SunTrust Mortg., Inc.*,
    2013 WL 5520010 (N.D. Okla. Oct. 3, 2013) ........................................................ 35

*Griffin v. Dugger*,
    823 F.2d 1476 (11th Cir. 1987) ......................................................................... 30

*Guerrero v. Target Corp.*,
    889 F. Supp. 2d 1348, 1356–57 (S.D. Fla. 2012) .................................................... 31

*Henderson v. Sun Pharmaceuticals Indus., Ltd.*,
    809 F.Supp. 2d 1373 (N.D. Ga. 2011).............................................................. 24, 25

*Hill v. Hoover Co.*,
    899 F. Supp. 2d 1259 (N.D. Fla. 2012) ................................................................ 22

*Husky Indus., Inc. v. Black*,
    434 So. 2d 988 (Fla. 4th DCA 1983) ................................................................... 12

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*,
    14 F. Supp. 3d 99 (E.D.N.Y. 2014) ..................................................................... 35

*Jennings v. BIC Corp.*,
    181 F.3d 1250 (11th Cir. 1999) ..................................................................... 12, 22

*Johnson v. Bobcat Co.*,
    175 F. Supp. 3d 1130 (D. Minn. 2016) ................................................................. 10

*Karhu v. Vital Pharma, Inc.*,
    2014 WL 815253 (S.D. Fla. Mar. 3, 2014).............................................................. 22

*Kaufman v. Pfizer Pharmaceuticals, Inc.*,
    2010 WL 9438673 (S.D. Fla. Nov. 23, 2010) ................................................. 23, 26

*Kazanzas v. Walt Disney World Co.*,
    704 F.2d 1527 (11th Cir. 1983) ................................................................... 33

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ..................................................................... 10

*Keating v. Nordstrom, Inc.*,
    2018 WL 576825 (D. Alaska Jan. 26, 2018) .................................................. 10

*Keegan v. Am. Honda Motor Co.*,
    838 F. Supp. 2d 929 (C.D. Cal. 2012) ......................................................... 11

*Kerrigan v. ViSalus, Inc.*,
    112 F. Supp. 3d 580 (E.D. Mich. 2015) ....................................................... 10

*Kirchner v. Ocwen Loan Servicing, LLC*,
    2017 WL 7411027 (S.D. Fla. Mar. 15, 2017) ................................................ 11

*Leon v. Cont'l AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017) ........................................................ 10

*Licul v. Volkswagen Grp. of Am., Inc.*,
    2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) .................................................. 34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 29

*Mann v. Paker*,
    713 F.3d 1306 (11th Cir. 2013) ................................................................... 10

*Martinez v. Weyerhauser Mortg. Co.*,
    959 F. Supp. 1511 (S.D. Fla. 1996) ............................................................. 31

*Marty v. Anheuser-Busch Cos.*,
    43 F. Supp. 3d 1333 (S.D. Fla. 2014) ..................................................... 29, 30

*Marzullo v. Crosman Corp.*,
    289 F. Supp. 2d 1337 (M.D. Fla. 2003) ....................................................... 22

*Master Fin., Inc. v. Crowder*,
    972 A.2d 864 (Md. 2009) ............................................................................ 35

*McKinney v. Microsoft Corp.*,
    2011 WL 13228141 (S.D. Ohio May 12, 2011) ............................................. 11

*Mills v. Bristol-Myers Squibb Co.*,
　2011 WL 3566131 (D. Ariz. Aug. 12, 2011)............................................................... 18

*Nichols v. Barwick*,
　792 F.2d 1520 (11th Cir. 1986) ................................................................................... 23

*O'Shea v. Littleton*,
　414 U.S. 488 (1974)..................................................................................................... 29

*Palladium Techs., Inc. v. M/Y "AMICA,"*,
　2017 WL 5674733 (S.D. Fla. Nov. 27, 2017) ............................................... 10, 20, 27

*Palm Partners LLC v. Palm Beach Treatment Ctr., LLC*,
　2017 WL 5668050 (S.D. Fla. 2017) ............................................................................ 10

*Pelman v. McDonald's Corp.*,
　396 F.3d 508 (2d Cir. 2005) ........................................................................................ 11

*Perret v. Wyndham Vacation Resorts, Inc.*,
　846 F. Supp. 2d 1327 (S.D. Fla. 2012) ....................................................................... 10

*Pinero v. Jackson Hewitt Tax Serv. Inc.*,
　594 F. Supp. 2d 710 (E.D. La. 2009)........................................................................... 10

*Prohias v. Pfizer, Inc.*,
　490 F. Supp. 2d 1228 (S.D. Fla. 2007) ....................................................................... 31

*Raie v. Cheminova, Inc.*,
　336 F.3d 1278 (11th Cir. 2003) ................................................................................... 34

*Rice v. Walker*,
　359 So. 2d 891 (Fla. 3d DCA 1978)....................................................................... 12, 18

*Ries v. Ariz. Beverages USA LLC*,
　287 F.R.D. 523 (N.D. Cal. 2012)................................................................................. 35

*Sanchez v. Loffland Bros. Co.*,
　626 F.2d 1228 (5th Cir. 1980) ..................................................................................... 33

*Schwebe v. AGC Flat Glass N. Am., Inc.*,
　2013 WL 2151551 (N.D. Ill. May 16, 2013) ............................................................... 10

*Simon v. Celebration Co.*,
　883 So. 2d 826 (Fla. 5th DCA 2004) ........................................................................... 27

*Spaulding v. Wells Fargo Bank, N.A.*,
　714 F.3d 769 (4th Cir. 2013) ....................................................................................... 10

*Stahl v. U.S. Dep't of Agric.*,
   327 F.3d 697 (8th Cir. 2003) ................................................................. 8

*State of Fla. v. Tenet Healthcare Corp.*,
   420 F. Supp. 1288 (S.D. Fla. 2005) ...................................................... 31

*Underground Solutions, Inc. v. Palermo*,
   2014 WL 4703925 (N.D. Ill. Sept. 22, 2014) ...................................... 35

*Universal Express, Inc. v. U.S. S.E.C.*,
   177 Fed. Appx. 52 (11th Cir. 2006) ....................................................... 8

*Vazquez v. Gen. Motors, LLC*,
   2018 WL 447644 (S.D. Fla. Jan. 16, 2018) .................................. 10, 20

*Viridis Corp. v. TCA Global Credit Master Fund, LP*,
   155 F. Supp. 3d 1344 (S.D. Fla. 2015) ............................................... 32

*Wright v. Howmedica Osteonics Corp.*,
   2018 WL 3301556 (11th Cir. July 5, 2018) .................................. 12, 18

Statutes

21 U.S.C. § 361 ........................................................................................ 16

815 ILCS 505/10a(e) ................................................................................ 35

ALASKA STAT. ANN. § 45.50.531(f) ......................................................... 34

CAL. CIV. CODE § 1783 ............................................................................. 35

IOWA CODE ANN. § 714H.5 ...................................................................... 34

TEX. BUS. & COM. CODE ANN. § 17.565 .................................................. 34

Rules

Fed. R. Civ. P. 9(b) ................................................................................... 10

Fed. R. Civ. P. 12(b)1 ......................................................................... *passim*

Fed. R. Civ. P. 12(b)6 ......................................................................... *passim*

## TABLE OF DEFINED TERMS

| | |
|---|---|
| "Alcora" | Alcora Corporation |
| "Amended Master Complaint" | First Amended Master Consolidated Class Action Complaint |
| "B&R" | B&R Products Inc. |
| "BBB" | Better Business Bureau |
| "CIR" | Cosmetic Ingredient Review |
| "Consumer Claims" | Plaintiffs' state law deceptive trade practice and consumer protection claims |
| "Establishment Inspection Report" or "EIR" or "FDA inspector's report" | FDA inspector's report relating to FDA inspection of B&R Products Inc.'s facilities from March 12 through March 20, 2018 |
| "FDA" | United States Food and Drug Administration |
| "FDCA" | United States Federal Food, Drug, and Cosmetic Act |
| "FDUTPA" | Florida Deceptive and Unfair Trade Practices Act |
| "GMP" | Good Manufacturing Practices |
| "Groups" | Facebook Groups that launched an anticompetitive, misinformation campaign against Monat in early 2018, which administered by hair stylists who sell competing hair care products |
| "IOM" | FDA Investigations Operations Manual |
| "Market Partners" | Independent-contractor distributors who sell Monat's products |
| "Master Complaint" | Master Consolidated Amended Complaint |
| "MMWA" | Magnuson-Moss Warranty Act |
| "Monat" | Monat Global Corp |
| "SJT" | Stevens-Johnson Syndrome |
| "TEN" | Toxic Epidermal Necrolysis |

## INTRODUCTION

Monat Global Corp ("Monat") is a designer, manufacturer, and distributor of hair care and cosmetic products, focusing on shampoos, conditioners, and rejuvenating oils. Similar to Avon and Mary Kay, Monat sells its products using a direct sales model through a network of independent "Market Partners," who market and distribute Monat's products. Monat also sells its products through its website. Monat has sold over 14 million units in the United States alone. In 2017, Monat achieved over $250 million in sales, and currently enjoys hundreds of thousands of satisfied customers. Monat has created unique product formulations, containing ingredients that have been tried, tested, and used in the cosmetics industry for years, and that have been found to be safe for consumer use, in the concentrations Monat uses them, either by industry experts or the Cosmetic Ingredient Review ("CIR"). The U.S. Food and Drug Administration ("FDA"), as well as leading companies in the cosmetic and beauty industry world-wide, rely on the safety findings of the CIR. Further, all of Monat's products are made in facilities that comply with cosmetic Good Manufacturing Practices (GMP), are registered and operated in accordance with FDA regulations, and subject to FDA audit and inspection.

Monat has made no significant changes to its major products over the past three years. Yet, in early 2018, Monat came under a flurry of attacks, emanating from two online Facebook groups (the "Groups") administered, orchestrated, and promoted by a number of hair stylists who sell competing products. These hair stylists have falsely claimed, without any scientific or clinical evidence, that Monat's products cause everything from balding to miscarriages, infertility, changed menstrual cycles, migraines, bloody stool, and much more. Some have gone so far as to claim that Monat's hair care products can exacerbate or even cause cancer. These outlandish claims have gained traction as they are repeated on the Internet as fact. Although Plaintiffs here have not relied on some of the most outrageous claims emanating from the Group,

the underlying putative class actions were filed on the heels of the firestorm the Group created, and Plaintiffs assert the same claims of extreme hair loss and serious scalp irritation.

While this Motion must assume the truth of Plaintiffs' allegations—and the Court need not consider the above facts here—this factual and scientific context informs the need to hold Plaintiffs accountable to important pleading rules and standards before allowing the case to proceed. Plaintiffs have failed to satisfy those rules and standards, and thus, their First Amended Master Consolidated Class Action Complaint ("Amended Master Complaint") should be dismissed.

The gist of Plaintiffs' case is that Monat's hair care products make people's hair fall out and/or cause severe skin reactions. Virtually all of Plaintiffs' misrepresentation and bodily injury claims are premised on these allegations of harm. But the allegation that a shampoo or conditioner made someone's hair fall out, or caused severe skin reactions, is serious and somewhat radical. Hair loss and scalp sores are not common side effects of shampoo and conditioner. Thus, one would expect Plaintiffs' claims to be accompanied by plausible allegations about how and why Monat's products caused these issues. In fact, the law requires it. And, Plaintiffs should have been in a position to do this, given they claimed in a prior court filing that they retained and consulted the "nation's preeminent experts on hair loss and other dermatological issues" as far back as July 2018.

But Plaintiffs' Master Consolidated Amended Complaint ("Master Complaint"), which aggregated and amended 10 individual complaints, failed to assert any allegations whatsoever as to how Monat's products are purportedly defective, or how they could have caused the harm Plaintiffs claimed to have suffered. After Monat's Motion to Dismiss identified these glaring omissions, Plaintiffs conceded the insufficiencies, opting to amend, rather than defend, their

Master Complaint. But Plaintiffs' second consolidated attempt, and third attempt overall if you consider the initial set of ten individual complaints Plaintiffs filed, fails for precisely the same reason—Plaintiffs do not sufficiently allege a product defect or causation of injury.

In their Amended Master Complaint, Plaintiffs contend that Monat's products are defective based solely on observations contained in an FDA inspector's report—a public record. *See* Amended Master Complaint, ¶¶ 169–75. As explained below, Plaintiffs misunderstand and mischaracterize the FDA inspector's report, which on its face, provides no support for Plaintiffs' claims. Further, Plaintiffs fail to assert *any* factual allegations regarding *how* the findings in the FDA inspector's report proximately caused their injuries, or the injuries they claim consumers are experiencing generally. Accordingly, Plaintiffs' Amended Master Complaint falls far short of the plausibility threshold on both of these case critical issues.

Given the implausibility of their defect theory, and failure to even attempt to plead proximate causation, Plaintiffs implicitly ask this Court to draw an inference and assume a cause and effect relationship simply from the sheer number of alleged complaints about Monat's products. But common sense dictates otherwise when Plaintiffs have offered no plausible theory of any kind to support that inference, and when far more plausible explanations for hair loss and skin irritation exist. To name a few, age, genetics, health conditions, medications, and heat and color treatments.

In the age of the Internet, when it is possible to solicit support for even the most implausible notions, Plaintiffs should be required to identify more than the existence of an online, anticompetitive smear campaign to support product liability and consumer fraud claims. That is especially true here, where Monat sells products to people who are already experiencing hair loss—a common effect of aging. As explained in detail below, several of the named

Plaintiffs admitted in their prior, individual complaints that they suffer from pre-existing conditions that include hair loss and skin irritation as symptoms.

Almost one year after the first underlying putative class action was filed, Plaintiffs are no closer to alleging a plausible theory that articulates how Monat's products are defective or how they caused the alleged harm. Instead, they want the gruesome and embarrassing nature, and the sheer number of individuals allegedly harmed, to obviate the need to identify a defect or articulate a causal connection. That, however, is not the law and Defendants should not be subjected to the arduous MDL process when Plaintiffs are unable to allege a viable theory of liability.

## ALLEGATIONS ASSUMED TO BE TRUE

### I.      Generally

On December 20, 2018, Plaintiffs filed their Amended Master Complaint asserting 25 putative class action claims, against three Defendants, under the laws of 13 separate states. [ECF No. 99 (Amended Master Complaint)]. The 18 Plaintiffs accuse Defendants of manufacturing and distributing defective products, failing to disclose purported harm caused by such products, and making false marketing representations. *See*, *e.g.*, *id.* ¶¶ 2–8. Plaintiffs seek to bring claims on behalf of a nationwide class for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), violation of the Magnuson-Moss Warranty Act ("MMWA"), breach of the implied warranty of merchantability, violation of express warranty, negligence, negligent failure to warn, strict liability for design defect, strict liability for failure to warn, strict liability for manufacturing defect, and unjust enrichment. *Id.* ¶¶ 213–325. In the alternative, Plaintiffs assert claims on behalf of statewide classes under 19 separate, state deceptive trade practice and consumer protection statutes ("Consumer Claims"). *Id.* ¶¶ 326–496.

## II.     Defendants

Monat is a Florida corporation with its principal place of business in Miami, Florida. *Id.* ¶ 23. Monat designs, manufactures, and distributes hair care and personal products throughout the United States. *Id.* Monat is a multi-level marketing, or direct sales, company, meaning it sells products through numerous, independent-contractor distributors ("Market Partners"). *Id.* ¶ 99. Since October 2014, Monat has sold over 14 million product units in the United States. *Id.* ¶ 23.

B&R Products, Inc. ("B&R") is a Florida corporation with its principal place of business in Miami, Florida. *Id.* ¶ 25. As Monat's primary manufacturer, B&R formulates and manufactures Monat's products. *Id.*

Alcora Corporation ("Alcora") is a Florida corporation with its principal place of business in Miami, Florida. *Id.* ¶ 24. Plaintiffs allege that Alcora "designs, develops, manufactures, and distributes hair care and beauty products, including all of the Products at issue in this litigation." *Id.* Alcora is a holding company for Monat and B&R. *Id.* ¶ 24.

Plaintiffs assert that Defendants have overlapping leadership, that Alcora and Monat share a corporate address, and that Defendants are "family-owned." *Id.* ¶¶ 26–28, 83. On these allegations alone, Plaintiffs conclude that Defendants exercise "control over each other without respect of corporate formalities of separate existences." *Id.* ¶ 28, 83.

## III.    Plaintiffs' Use of Monat's Products and Alleged Injuries

Plaintiffs are 18 individuals who reside in 15 separate states. *Id.* ¶ 34. Each Plaintiff alleges he or she used some subset of approximately 37 separate Monat products, ranging from shampoos and conditioners, to men's cream shave and styling clay. *Id.* Plaintiffs seek to represent a nationwide class of individuals who purchased Monat's "Products," a term which Plaintiffs

define as the Monat products they have used and purchased.[1] *Id.* ¶¶ 34 (n. 3), 198. Alternatively, Plaintiffs seek to represent statewide classes relating to the states in which they reside. *Id.* ¶ 199.

Plaintiffs' individual allegations of bodily harm and damage suffered from Monat's products are limited and uniform. *Id.* ¶¶ 41–57. Each Plaintiff alleges: (i) the state in which he or she resides; (ii) the Monat products he or she purchased, and the dates on which he or she used them; (iii) the length of time after which he or she started "experiencing effects," which uniformly, are some combination of "hair loss, scalp sores, [or] severe scalp irritation"; and (iv) whether he or she sought any "treatment" for the "injuries [he or she] sustained." *See*, *e.g.*, *id.* ¶ 41.

For example, Don Winter alleges that he resides in Alaska, purchased nine Monat products between November 17, 2017 and March 4, 2018, began experiencing "effects" (including "hair loss, scalp sores, and severe scalp irritation") within four months of use, and sought the assistance of his hair dresser and an esthetician for the injuries he allegedly sustained. *Id.* ¶ 39. Dana Sohovich alleges that she resides in California, purchased nine Monat products from September 17, 2017 to October 9, 2017, began experiencing "hair loss and severe scalp irritation" one and one-half months after she began using the products, and had to seek "medical treatment" for the "injuries" she allegedly sustained. *Id.* ¶ 43. Plaintiffs allege repeatedly and in conclusory fashion that "Monat Products in fact cause significant hair loss, hair breakage, scalp sores, infection, and severe skin reactions." *Id.* ¶ 38.

---

[1] Therefore, Plaintiffs claims are limited to the products they used and purchased. [ECF No. 99, ¶ 34, note 3].

## IV.    Defendants' Marketing Representations

Plaintiffs allege, in detail and at length, the marketing representations made by Monat regarding favorable or beneficial attributes of its products. These representations include statements that Monat's products are "FDA-approved," "safe," non-toxic, "high-quality," "naturally based," "pure and sustainable," suitable for all skin and hair types, (*id. ¶¶* 2–6, 64–96), and that the products "provide curative health benefits, with the ability to grow hair and impact hormonal levels to prevent hair loss." *Id.* ¶ 2. Plaintiffs allege that "Defendants further promise that Monat Products are made in the United States in a facility approved by the U.S. Food and Drug Administration (FDA), that the Products are 'FDA approved,' and that Defendants meet their 'responsibility to offer Products that meet only the highest quality standards and [which] are made only with safe ingredients.'" *Id.* ¶ 4.

## V.    Defendants' Alleged Misconduct

Plaintiffs assert that Defendants' marketing claims are false because, instead of providing the advertised beneficial attributes, Monat's products are defective and actually cause hair loss and severe scalp problems. *Id.* ¶¶ 1, 8, 13, 15, 36–38, 120–47, 148, 158, 165–67. For example, Plaintiffs state, "far from the panacea promised by Defendants, Monat Products can cause embarrassing and extreme hair loss, hair breakage, head sores, infections requiring antibiotic treatment and other severe skin reactions." *Id.* ¶ 8. Plaintiffs claim the "hair loss is not *de minimis*—consumers, who suffer hair loss often lose significant amounts of hair—and once it begins it can often continue for weeks or months before abating, even if the consumer immediately discontinues use of the Products." *Id.* Additionally, Plaintiffs allege that Monat's products are "far from pure" because they contain "harsh chemicals" including Cocamidopropyl Betaine, Benzyl Alcohol, Red Clover Leaf Extract, Trideceth-6, C11-15 Pareth-7, and Butylene Glycol. *Id.* ¶ 176.

Plaintiffs additionally claim they suffered personal injuries including hair loss and scalp irritation "as a result of the defects in Monat products, which include, but are not limited to: (1) the inclusion of the four defective Key Ingredients [Procataline, Rejuveniqe, Capixyl, and Crodasorb]; (2) the lack of biocides in the Products; and (3) the adulterated nature of the Products." *Id.* ¶ 63. Plaintiffs support their claim that Monat products are defective based only on findings in an FDA inspector's report, which is a matter of public record. *See* FDA Establishment Inspection Report for B&R Products, Inc., FEI NUMBER 3003505078 ("FDA inspector's report" "Establishment Inspection Report" or "EIR"), attached as **Exhibit A**.[2]

In support of their contentions, Plaintiffs quote extensively from online complaints made to the Better Business Bureau ("BBB"). They also cite the number of complaints made to the BBB and to the FDA concerning Monat's products. *Id.* ¶¶ 9, 108–135. Plaintiffs claim that Defendants were on notice of defects in its products by virtue of such third-party complaints. *Id.* ¶ 226. Despite Plaintiffs' numerous allegations regarding Monat's harmful products, Plaintiffs never allege *how* they believe the products proximately cause harm. *See generally*, *id.*

Finally, Plaintiffs allege that: "[a]s a result of Defendants' failure to recall defective Monat Products, fully disclose risks associated with these Products, and continued misrepresentations about the safety and efficacy of the Products, consumers continue to suffer from damages caused by Monat Products." *Id.* ¶ 165. Plaintiffs conclude they "suffered injury as

---

[2] "The district court may take judicial notice of public records and may thus consider them on a motion to dismiss." *Universal Express, Inc. v. U.S. S.E.C.*, 177 Fed. Appx. 52, 52 (11th Cir. 2006) (quoting *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003)). Moreover, the Court can consider a document attached to a motion to dismiss where it is "central to the plaintiff's claim," and its authenticity is not challenged. *See Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). The FDA inspector's report may be considered here under either or both doctrines, because it is a public record, critical to Plaintiffs' claims, and its authenticity is not in dispute.

a result of Defendants' concealment, misrepresentations and/or deceptive and unfair trade practices, and are entitled to relief." *Id.* ¶ 167.

*          *          *

Critically, however, in addition to failing to allege how Monat's products could have caused the harms Plaintiffs contend they suffered, the Amended Master Complaint does not allege the nature of the "treatments" they allegedly obtained, the frequency with which Plaintiffs used Monat's products, whether Plaintiffs used Monat's products "as directed," whether Plaintiffs used any other hair products or treatments during the relevant period, and the absence of other factors that could have caused Plaintiffs' alleged injuries.

## APPLICABLE STANDARDS

### I.   Federal Rule of Civil Procedure 12(b)(6) Applies to Counts II–X

Applicable pleading standards are particularly important to this case. Federal Rule of Civil Procedure 12(b)(6) requires that a complaint "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotes omitted). Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal quotes omitted). "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

Further, Plaintiffs' allegations are "based on personal knowledge as to themselves" only, and "upon information and belief as to *all other matters*." [ECF No. 99, at 1 (Preamble) (emphasis added)]. Plaintiff's allegations on "information and belief" need not be taken as true.

*Mann v. Paker*, 713 F.3d 1306, 1315 (11th Cir. 2013); *Palm Partners LLC v. Palm Beach Treatment Ctr., LLC*, 2017 WL 5668050, at *2 (S.D. Fla. 2017).

II.     **Federal Rule of Civil Procedure 9(b) Applies to Plaintiffs' State Consumer Protection and Unfair Trade Practices Act Claims (Counts I, XI-XXV) Because they Sound in Fraud**

To allege fraud or mistake, "a party must state with particularity the circumstances surrounding the fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b)'s heightened pleading standard requires plaintiffs to allege, with specificity, the "who, what, when, where, and how of the allegedly false statements." *Palladium Techs., Inc. v. M/Y "AMICA,"* 2017 WL 5674733, at *2 (S.D. Fla. Nov. 27, 2017) (Gayles, J.). This Court, and others in this District, have held that FDUTPA claims must satisfy Rule 9(b), where such claims sound in fraud. *Vazquez v. Gen. Motors, LLC*, 2018 WL 447644, at *6 (S.D. Fla. Jan. 16, 2018) (Gayles, J.); *see also Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1226 (S.D. Fla. 2017); *Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1333 (S.D. Fla. 2012). Likewise, the vast majority of federal courts across the country apply Rule 9(b) to Plaintiffs' other state Consumer Claims, which also sound in fraud.[3]

---

[3] *See Keating v. Nordstrom, Inc.*, 2018 WL 576825, at *7 (D. Alaska Jan. 26, 2018) (Alaska Unfair Trade Practices and Consumer Protection Acts); *Beshears v. Provident Life & Acc. Ins. Co.*, 2007 WL 1438738, at *3 (D. Ariz. May 15, 2007) (Arizona Consumer Fraud Act); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (California Consumer Legal Remedies Act and California Unfair Competition Law); *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1010 (N.D. Cal. 2014) (California False and Misleading Advertising Law); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (Illinois Consumer Fraud and Deceptive Business Practices Act); *Schwebe v. AGC Flat Glass N. Am., Inc.*, 2013 WL 2151551, at *3 (N.D. Ill. May 16, 2013) (Illinois Uniform Deceptive Trade Practices Act); *Pinero v. Jackson Hewitt Tax Serv. Inc.*, 594 F. Supp. 2d 710, 721 (E.D. La. 2009) (Louisiana Unfair Trade Practices and Consumer Protection Law); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (Maryland Consumer Protection Act); *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 612 (E.D. Mich. 2015) (Michigan Consumer Protection Act); *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1145 (D. Minn. 2016) (Minnesota Consumer Fraud Act and Minnesota Uniform Deceptive Trade Practices Act); *Elfaridi v. Mercedes-Benz USA, LLC*, 2018

In fact, the Amended Master Complaint is replete with allegations that sound in fraud. Plaintiffs accuse Defendants of: "deceptive, misleading and, in some cases, objectively false marketing claims" (ECF No. 99, ¶ 37); marketing their products with "undisclosed health and safety risks," (*id*. ¶ 57); making "unsupported, false and/or misleading" representations (*id*. ¶ 95); of "conceal[ing] the true risks associated with Monat Products" (*id*. ¶ 156); and doing so with "knowledge that their advertisements are misleading" (*Id*. ¶ 157). Every cause of action in the Amended Master Complaint is based on the same conduct and allegations. *Id*. ¶ 193 (incorporating every "Common Factual Allegation" into every claim for relief). Accordingly, Plaintiffs must meet the heightened pleading standard of Rule 9(b) with respect to Counts I, and XI through XXV.

## **ARGUMENT**

### **I.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THEY FAIL TO SUFFICIENTLY PLEAD THE EXISTENCE OF A PRODUCT DEFECT AND CAUSATION OF INJURY**

In Florida, liability for a defective product requires a plaintiff to demonstrate that a manufacturer made the product in question, that the product has a defect rendering it

---

WL 4071155, at *3 (E.D. Mo. Aug. 27, 2018) (Missouri Merchandise Practices Act); *McKinney v. Microsoft Corp*., 2011 WL 13228141, at *14 (S.D. Ohio May 12, 2011) (Ohio Consumer Sales Practices Act); *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 800 (N.D. Tex. 2009) (Texas Deceptive Trade Practices – Consumer Protection Act). (Continues on following page) While the Second Circuit would not apply Rule 9(b) to a claim under the New York General Business Law Section 349 (*see, e.g.*, *Pelman v. McDonald's Corp*., 396 F.3d 508, 511 (2d Cir. 2005)) this Court should do so because the New York claim sounds in fraud. *see also Kirchner v. Ocwen Loan Servicing, LLC*, 2017 WL 7411027, at *11 (S.D. Fla. Mar. 15, 2017) (applying Rule 9(b) to a claim under New York Section 349 because it sounded in fraud); *Keegan v. Am. Honda Motor Co*., 838 F. Supp. 2d 929, 957 (C.D. Cal. 2012) (declining to follow *Pelman*, and applying Rule 9(b) to Section 349 claim).

Though Defendants were unable to locate any decisions applying Rule 9(b) to the Iowa Consumer Frauds Act and the Oklahoma Consumer Protection Act, for the reasons discussed above, this Court should apply Rule 9(b) to these claims as well.

"unreasonably dangerous," and that the unreasonably dangerous condition is the "proximate cause of the plaintiff's injury." *Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir. 1999). Here, Plaintiffs fail to plausibly allege how Monat's products are defective, and how any defect might have caused Plaintiffs' injuries. Therefore, all of Plaintiffs' claims that are based on the existence of a product defect should be dismissed.

**A.      Plaintiffs' Product Liability, Negligence, Failure to Warn, Unjust Enrichment, and Breach of Express and Implied Warranty Claims Should be Dismissed Because Plaintiffs Fail to Plausibly Allege that Monat's Products are Defective (Fed. R. Civ. P. 12(b)(6))**

Pleading the existence and nature of a product defect is the *sine qua non* of alleging claims for strict products liability. *See Wright v. Howmedica Osteonics Corp.*, 2018 WL 3301556, at *2 (11th Cir. July 5, 2018); *Rice v. Walker*, 359 So. 2d 891, 892 (Fla. 3d DCA 1978). Likewise, the existence of a product defect is a critical element of a breach of implied warranty of merchantability claim. *See Husky Indus., Inc. v. Black*, 434 So. 2d 988, 995, n. 3 (Fla. 4th DCA 1983).

Furthermore, Plaintiffs premise their negligence, failure to warn, unjust enrichment, and breach of express and implied warranty claims on the idea that Monat's products are defective. [ECF No. 99, ¶¶ 248 (MMWA claim); *id.* ¶¶ 265–66 (Violation of Express Warranty claim); *id.* ¶¶ 272–75 (Negligence claim); *id.* ¶¶ 279–81 (Negligence – Failure to Warn claim); *id.* ¶¶ 294–95, 298 (Strict Liability – Failure to Warn claim); *id.* ¶ 311 (Unjust Enrichment claim)]. Consequently, Plaintiffs must plausibly allege a defect to support those claims.

            1.      Given that Plaintiffs Claimed they Retained Preeminent Hair Care and Testing Experts Over Six Months Ago, They Should Have Been Well-Positioned to Identify a Plausible Product Defect

Over six months ago, in their bid to be appointed lead counsel, several of Plaintiffs' Counsel proclaimed in a court filing that their team had "identified and retained the nation's

preeminent experts on hair loss and other dermatological issues from haircare." [ECF No. 56, at 7].[4] "[C]ounsel quickly retained Howard Maibach," described as "the preeminent expert" on relevant hair care issues. *Id.* In addition, Plaintiffs' Counsel retained "[o]ther experts for different facets of testing," including "Arun Nandagiri of Bria Labs in Libertyville, IL, and other non-testifying consulting research experts." *Id.* at 8. Finally, Plaintiffs' Counsel claimed her team was in "direct contact with hundreds of class members[5] to gather information concerning the specific products used, the time frame they were used and their reported adverse reactions as part of [their] work-product for presentation to [Counsel's] team of experts." *Id.* at 7. Armed since July 2018 with data from hundreds of putative class members, and with sophisticated experts, presumably Plaintiffs were equipped to allege how they believed Monat's products were defective.

To the contrary, in Plaintiffs' original Master Complaint, despite referring to Monat's products as containing a "defect," "defects," or as being "defective" *106 times*, astonishingly, Plaintiffs *never identified a defect in Monat's products whatsoever*. In their Motion to Dismiss the Master Complaint, Defendants argued that Plaintiffs' omission was fatal to their claims. Plaintiffs sought to amend, rather than defend, their Master Complaint. But Plaintiffs' Amended Master Complaint fares no better. Now, Plaintiffs rely on an FDA inspector's report that provides no support for the proposition that Monat's products are defective.

---

[4] The Court may take judicial notice of public records and may thus consider Plaintiffs' prior filing here. *See infra* at 8, n. 2.
[5] Although Counsel referred to certain individuals as "class members," no class has been certified.

-13-

2.      The FDA Inspector's Report Does not Even Give Rise to an Inference that
        Monat's Products are Defective

From March 12 through March 20, 2018, FDA conducted an inspection of B&R's facilities, where Monat's products are manufactured. Ex. A (FDA inspector's report),[6] at 3; *see also* ECF No. 99, ¶ 168. An FDA inspector and toxicologist audited the facilities, manufacturing processes, formulas, labeling and packaging materials, safety testing materials, finished and unfinished products and certain manufacturing records. Ex. A, at 2. In addition to a comprehensive audit, the inspector took 18 Monat product samples from B&R for testing. *Id.* Following its inspection, FDA published a Form 483 inspection report, fairly characterized as citing minor issues unrelated to product safety. *See* FDA Form 483 inspection report, attached as **Exhibit B**.[7] FDA never concluded there was even a *possibility* that Monat's products had been rendered "injurious to health." *See* Ex. A; Ex. B. FDA never concluded that Monat's products, or the samples FDA obtained, were actually contaminated. *Id.* FDA never requested a recall of Monat's products, never issued a warning letter, never seized any product, and never threatened to initiate consent decree/injunction proceedings. *Id.* Rather, on September 10, 2018, Monat received a "Close Out" letter from FDA, stating that the corrective actions Monat proposed in response to FDA's inspection report "should adequately address the observations." *See* FDA Closeout Letter, attached as **Exhibit C**.[8]

Lacking any theory regarding how Monat's products are defective, Plaintiffs rely on the FDA inspection. Fatally for Plaintiffs' claims, however, the FDA inspection does not give rise to even an inference that Monat's products cause the injuries Plaintiffs allege. Six out of the eight

---

[6] As a public record, the court may consider the FDA inspector's report here. *See infra* at 8, n. 2.

[7] The FDA Form 483 inspection report is a public record, and therefore, may be considered here. *See infra* at 8, n. 2.

[8] As a public record, the Court may consider the FDA Close Out letter here. *See id.*

findings noted by Plaintiffs (ECF No. 99, ¶ 172) were contained only in the FDA Establishment

Inspection Report (EIR) (referred to here as the "FDA inspector's report"). [*Compare* ECF No.

99, ¶ 172 *with* Ex. A, at 10–12, 20–21]. By FDA's own estimation, the FDA inspector's report

contains observations that are not significant or even questionably significant. *See* FDA

Investigations Operations Manual ("IOM"),[9] at 5.2.3. Such lack of significance is obvious on the

face of the findings Plaintiffs cite, which include notes regarding: two raw material ingredient

labels that deviated from B&R's color-coding scheme; B&R's practice of labeling ingredient-

filled plastic drums based on the weight needed for a given product formulation, rather than the

weight of the plastic drum; and purportedly incomplete documentation relating to several

consumer complaints.  [ECF No. 99, ¶ 172]; Ex. A, at 10–12, 20–21.

        In contrast to an EIR, findings relating to "significant objectionable conditions" are noted

by FDA inspectors in an FDA Form 483. *See* IOM, at 5.2.3.2.  In the Form 483 issued to B&R,

the FDA inspector stated she observed: a reactor with an open lid containing an in-process

product; residues of product in the upper part of a reactor; three cleaned and sanitized hoses

without protective caps; an employee jacket stored in close proximity to a "filling line;" and

empty containers of the Monat product, "Rejuvabeads," left uncovered in a filling line. These

findings warranted only a single "Observation" from the FDA inspector,[10] quoting language from

---

[9] The FDA describes the IOM as the "primary operational guide for FDA employees who perform field investigational activities in support of the agency's public health mission. Accordingly, the IOM directs the conduct of all fundamental field investigational activities. Adherence to this manual is paramount to assure quality, consistency, and efficiency in field operations." IOM (2018 Forward), *available at https://www.fda.gov/downloads/ ICECI/Inspections/IOM/UCM291748.pdf.*

[10] Publicly available Form 483s on FDA's website demonstrate that many large, well-known manufacturers across numerous regulated industries receive multiple Observations. *See*, *e.g.*, Pfizer/Hospira (8 Observations); Zimmer Biomet (11 Observations); Whole Foods Market (6 Observations).

the Food, Drug, and Cosmetic Act (FDCA), stating, "[y]our cosmetic was prepared, packed, or held under insanitary conditions whereby it *may* have become contaminated with filth." 21 U.S.C. § 361(c) (emphasis added); [*see also* ECF No. 99, ¶ 170]. Tellingly absent from the FDA inspector's quotation is language from the second clause of Section 361(c), which states, ". . . or whereby [your cosmetic] may have been rendered injurious to health." *Id.* In other words, the inspector found no meaningful risk that the conditions she observed could lead even to the *possibility* that the products were somehow rendered harmful.

Findings in a Form 483 could, in theory, create an inference of a defect. For example, a Form 483 may cite FDCA Section 361(a) finding that products "contain[ed] any poisonous or deleterious substance which may render it injurious to users." Or, FDA may cite FDCA Section 361(b), finding that products "consist in whole or in part of any filthy . . . substance." But these potential Form 483 findings simply do not exist in the FDA inspector's report relating to the inspection of B&R's facilities. *See* Ex. A. Further, Plaintiffs' pleadings, and the publicly filed documents on which this Court may rely, do not state that FDA ever requested a recall, issued a warning letter, seized product, or threatened to initiate consent decree/injunction proceedings. *See* Ex. A, at 2. Nor could they, because these things never happened.

Properly characterized, the documents relating to the FDA inspection on which Plaintiffs rely, and Plaintiffs' allegations regarding the FDA inspection, do not permit even an inference that Monat's products are defective. First, although Plaintiffs reiterate FDA's conclusory observation that Monat's products *may* have become contaminated with "filth," the mere possibility of contamination falls short of plausibly alleging a defect. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that the plausibility pleading standard requires more than a "sheer possibility" that the defendant is liable). FDA simply never made *any* finding that "filth" existed

in Monat's products. *See* Ex. A; Ex. B. In any event, Plaintiffs never explain how "filth," which Plaintiffs never bother to define or describe, could ever lead to the extreme personal injuries Plaintiffs claim to have suffered.

Second, the proposition itself that Monat's products ***may*** have become contaminated with filth is merely conclusory, and should not be taken as true at the pleading stage. *Davila*, 326 F.3d at 1185 ("conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."). What is important for the Court's analysis here are the actual facts alleged in the Amended Master Complaint, and the factual findings in the FDA inspector's report, which have nothing to do with product safety. For instance, a jacket too close to a filling, residue on a reactor, two labels that deviated from B&R's color-coding scheme, caps left off of cleaned and sanitized hoses, and empty containers of a single Monat product left without caps at the end of an employee work day. [ECF No. 99, ¶ 172]; Ex. B. None of these facts give rise to an inference that Monat's products could be defective.

Third, Monat addressed each issue the inspector identified in real time—an effort documented in the FDA inspector's report. *See* Ex. A. For instance, when the inspector found residue on a reactor, a B&R employee immediately cleaned it "using a textile cloth and Micro-90 (cleaning agent)." *Id.* at 12, 26. After the inspector identified a jacket next to a filling line, a B&R employee removed the jacket and stored it in a designated area. *Id.* at 26. Finally, FDA issued a "Close Out" Letter to B&R in September 2018, indicating that B&R properly addressed the issues FDA identified. Ex. C.

Nonetheless, Plaintiffs characterize the FDA inspector's report as "nothing short of shocking." [ECF No. 99, ¶ 169]. Plaintiffs, however, cannot substitute hyperbole for a real defect theory, and proper factual allegations in support of that theory.

-17-

3.  Plaintiffs' Failure to Identify a Defect in Monat's Products Warrants Dismissal of their Claims

With no viable factual allegations to support their conclusory assertions that Monat's products are defective, Plaintiffs find themselves in the very same position that led them to amend their original Master Complaint—they have not sufficiently alleged a product defect. Instead, Plaintiffs implicitly ask this court to draw an inference that Monat's products are defective based solely on complaints of hair loss and irritation. Decisions in this District and this Circuit, however, consistently hold that such an attempt should fail at the threshold. *See Wright*, 2018 WL 3301556, at *2 (11th Cir. 2018) (affirming dismissal of Plaintiff's strict products liability claim where she alleged only that she felt "pain after her surgery," but failed to allege how the subject medical device was defective); *Gomez v. Pfizer, Inc.*, 675 F. Supp. 2d 1159, 1163 (S.D. Fla. 2009) (dismissing products liability claim where Plaintiff alleged only that she developed medication induced Stevens–Johnson Syndrome after taking Motrin and Tylenol, and there were "no factual allegations suggesting what was in fact defective about the products.").

Florida state courts likewise dismiss product liability claims that fail to sufficiently allege a product defect. *See*, *e.g.*, *Rice*, 359 So. 2d at 892 (dismissing product liability claim where the plaintiff alleged that "various components" of a product were "unsafe," but did not explain "how, as made, any such components were defective or dangerous to the user, or how they reasonably could or should have been made safe.")

Indeed, federal courts across the country find that failure to sufficiently plead a product defect is fatal to a product liability claim. *Mills v. Bristol-Myers Squibb Co.*, 2011 WL 3566131, at *2 (D. Ariz. Aug. 12, 2011) (dismissing Plaintiff's product liability claims where she merely alleged "the harm [she] suffered after taking Plavix," and failed to allege "how the product itself [was] defective"); *Altman v. HO Sports Co., Inc.,* 2009 WL 4163512, at *1, *8 (E.D. Cal. Nov.

23, 2009) (allegations that plaintiff was injured using defendant's wakeboard bindings were insufficient to state a claim absent the identification of "what aspect of the [bindings] makes their design . . . defective"). The weight of authority, reflected in decisions from courts across the country, dictate dismissal here.

Moreover, an inference based on harm alone would be especially inappropriate here given the number of other known causes of hair loss and skin irritation. *See Iqbal*, 556 U.S. at 678 (determining plausibility is a "context-specific task," and permits a reviewing court to "draw on its judicial experience and common sense."). Such alternatives include: genetics, age, stress, health conditions, medications, alopecia, psoriasis, pregnancy, physical or psychological trauma, or overexposure to harsh chemicals like hair dyes or heat treatments. In fact, these alternative, causal factors have  a basis in science for causing the symptoms of which Plaintiffs complain, and constitute far more plausible explanations than the mere application of shampoos and conditioners. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 & 567 (2007) (holding a complaint failed to state a claim of antitrust conspiracy where there was an "obvious alternative explanation" to illegality). Plaintiffs' allegations do nothing to rule out these more plausible factors. In light of the insufficiency and implausibility of Plaintiffs' assertions regarding product defects, Plaintiffs' claims should be dismissed.

### B.   Plaintiffs' FDUTPA and Other Consumer Claims Suffer From the Same Fatal Infirmity—Failure to Sufficiently Allege a Product Defect

Plaintiffs' FDUTPA and other Consumer Claims are premised on the idea that Monat's products are defective, and therefore, such claims must adequately allege the existence of a defect. [*See* ECF No. 99, ¶¶ 218, 220–22 (relying on the existence of a product defect for Plaintiffs' FDUTPA claim); *id.* ¶¶ 316, 321, 326, 333, 337, 344, 348, 352–55, 363, 365–68, 373,

381–82, 385, 388, 393, 401–02, 405, 415–17, 419, 426–27, 429, 437, 439, 443–45, 447, 454–55, 457, 461–62, 466, 473–76, 478, 485–86, 490–91 (same for Plaintiffs' state Consumer Claims)].

Plaintiffs' FDUTPA claims, and other Consumer Claims, are especially weak given that they are subject to heightened scrutiny.[11] *Palladium Techs, Inc.*, 2017 WL 5674733, at *2 (recognizing that under Rule 9(b), plaintiffs must allege with specificity the "who, what, when, where, and how of the allegedly false statements."). Plaintiffs' allegations fail to identify with specificity, as they must, "how" Monat's products are defective, thereby rendering their marketing claims false. *See Dixon v. Allergan USA, Inc.*, 645 Fed. Appx. 930, 932 (11th Cir. 2016) (affirming dismissal of plaintiff's fraudulent misrepresentation claims for failure "to allege ***how*** the brochure's statements were untrue or misleading") (emphasis added). All FDUTPA and Consumer Claims that rely on a defect for their validity should be dismissed.

In *Vazquez* this Court provided a clear example of a FDUTPA claim, which relied on the existence of a product defect, with sufficient allegations to survive Rule 9(b). 2018 WL 447644 (Gayles, J.). There, the plaintiffs alleged that GM falsely marketed certain vehicles as suitable for high-performance, race track driving. *Id.* at *1. Plaintiffs, however, claimed the vehicles contained a design defect making them unsuitable for race track driving. *Id.* at *1–2. Plaintiffs alleged that a defective cooling system caused the cars to go into "Limp Mode" when driven at typical race track speeds; that the cars slowed down when they entered "Limp Mode;" and that the sudden deceleration brought on by the "Limp Mode" increased the risk of collisions. *Id.* at *1. Given the specific allegations of product defect in *Vazquez*, this Court found the plaintiffs provided the defendant "sufficiently detailed notice" of how the defendant's marketing

---

[11] In light of the above arguments, Plaintiffs' FDUTPA and Consumer Claims should be dismissed whether they are subject to review under Rule 12(b)(6) or 9(b).

representations were deceptive. *Id*. at *6. In contrast, Plaintiffs here fail to identify facts allowing for a plausible inference that Monat's products are defective. Thus, Plaintiffs' FDUTPA claims and Consumer Claims fall far short of Rule 9(b)'s heightened standard, and should be dismissed.

Nor can Plaintiffs rely on their allegation that Monat's products contain purportedly "harsh chemicals" (*i.e.*, Cocamidopropyl Betaine, Benzyl Alcohol, Red Clover Leaf Extract, Trideceth-6, C11-15 Pareth-7, and Butylene Glycol) (ECF No. 99, ¶ 176) to claim they have identified a product defect. Critically, Plaintiffs never expressly allege that these ingredients are the source of any underlying product defect. *Id.* (stating only that Monat's products are "far from pure" because they "contain harsh chemicals," without stating that these ingredients make Monat's products defective). Nor could Plaintiffs defensibly make such an allegation, given that the subject ingredients are *widely* used in the cosmetics industry, and recognized by experts as safe for consumers.

### C.  Plaintiffs' Claims Should be Dismissed Because they Fail to Allege Sufficiently that Monat's Products Cause Bodily Harm (Fed. R. Civ. P. 12(b)(6) and 9(b))

To state their claims properly, Plaintiffs must allege facts demonstrating that a product defect proximately caused their injuries. But Plaintiffs fail to assert *any* facts whatsoever demonstrating that Monat's products caused the allege harm. As noted above, *infra* at 14–18, the idea that a jacket next to a filling line, a few caps left off product bottles, or product residue on a single reactor, could lead to a widespread product defect, is utterly specious. But even assuming for the sake of argument that such technical issues *actually resulted* in "filthy" and defective products, Plaintiffs never even attempt to allege how such "filth" proximately caused their extreme hair loss, severe scalp irritation, and other bodily harm. Accordingly, Plaintiffs' claims should be dismissed.

      1.    <u>Causation of Injury is a Necessary Element of Plaintiffs' Product Liability and Failure to Warn Claims</u>

Plaintiffs' claims for Violation of the MMWA (Count II),[12] Breach of Implied Warranty of Merchantability (Count III), Negligence – Failure to Warn (Count VI), Strict Liability – Design Defect (Count VII), Strict Liability – Failure to Warn (Count VIII), and Strict Liability – Manufacturing Defect (Count IX) all require that Plaintiffs plausibly allege they suffered personal injury proximately caused by their use of Monat's products. *See Jennings*, 181 F.3d at 1255 (requiring that a product defect be the proximate cause of plaintiff's injury to establish a claim for strict products liability); *Marzullo v. Crosman Corp.*, 289 F. Supp. 2d 1337, 1342 (M.D. Fla. 2003) (same for negligence and failure to warn claims); *Barrow v. Bristol–Myers Squibb*, 1998 WL 812318, at *27 (M.D. Fla. 1998) (same for breach of the implied warranty of merchantability claims).

      2.    <u>The Balance of Plaintiffs' Claims Incorporate the Idea that Monat's Products Cause Bodily Harm, and Plaintiffs Must, Therefore, Sufficiently Allege Causation of Such Harm</u>

Each of Plaintiffs' remaining FDUTPA claims and Consumer Claims rely on assertions that Monat products cause bodily harm. [*See* ECF No. 99, ¶ 8 ("far from the panacea promised by Defendants, Monat Products can cause embarrassing and extreme hair loss, hair breakage, head sores, infections requiring antibiotic treatment and other severe skin reactions); *id.* ¶ 212 (incorporating every "Common Factual Allegation" into every claim for relief); *id.* ¶¶ 213, 227 (relying on assertions of bodily harm allegedly caused by Monat's products for Plaintiffs'

---

[12] "[I]n order to state a claim under the MMWA, the Plaintiff must adequately plead a cause of action for breach of written or implied warranties under Florida law." *Hill v. Hoover Co.*, 899 F. Supp. 2d 1259, 1266 (N.D. Fla. 2012); *see also Karhu v. Vital Pharma, Inc.*, 2014 WL 815253, at *7 (S.D. Fla. Mar. 3, 2014). Any argument in this Motion relating to Plaintiffs' state law express or implied warranty claims accordingly applies equally to their corresponding MMWA claims.

FDUTPA claim); *id.* ¶¶ 230, 241 (same for MMWA claim); *id.* ¶¶ 258, 266 (same for Violation of Express Warranty); *id.* ¶¶ 307, 312 (same for Unjust Enrichment claim); *id.* ¶¶ 316, 324, 326, 335, 337, 345, 348, 352, 360, 363, 365, 373, 381, 383, 385, 388, 393, 402, 405, 417, 419, 427, 429, 437, 439, 445, 447, 454–55, 457, 461–62, 466, 476, 478, 491 (same for state Consumer Claims)]. Consequently, Plaintiffs must plausibly allege that their use of Monat products caused bodily harm to support their claims in Counts I, and XI through XXV.

   3.   Plaintiffs Fail to Plausibly Allege That Monat's Products Caused their Bodily Harm

   Plaintiffs fail to assert any allegations whatsoever as to how Monat's products cause extreme hair loss, severe scalp irritation, and their other alleged injuries. *Nichols v. Barwick*, 792 F.2d 1520, 1522 (11th Cir. 1986) (affirming dismissal where, despite "featherweight" standard applicable to proximate causation element in maritime cases, plaintiff failed to present any evidence establishing that his injury was proximately caused by the allegedly defective product); *Kaufman v. Pfizer Pharmaceuticals, Inc.*, 2010 WL 9438673, at *5 (S.D. Fla. Nov. 23, 2010) (dismissing plaintiff's negligence and products liability claims where plaintiff failed to allege how each purportedly defective drug "caused her particular form of breast cancer.").

   Conclusory allegations such as the following are nearly ubiquitous in Plaintiffs' Amended Master Complaint: "far from the panacea promised by Defendants, Monat Products can cause embarrassing and extreme hair loss, hair breakage, head sores, infections requiring antibiotic treatment and other severe skin reactions." [ECF No. 99, ¶ 8]. While such ubiquity might suggest that Plaintiffs understand they *should* allege causation, they missed the mark entirely. *See Davila*, 326 F.3d at 1185 ("conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.").

Even assuming Monat's products were *actually* contaminated with filth—which FDA never found and Plaintiffs do not plausibly allege—Plaintiffs never explain how filth (*i.e.*, dirt, debris, etc.) could result in extreme hair loss, severe scalp irritation, and the other harms Plaintiffs allege. Dirt does not ordinarily cause these types of severe injuries. Moreover, Plaintiffs never allege any facts demonstrating that there was filth in the products they actually used, or how any of the issues cited in the FDA inspector's report impacted those specific products.

Dismissal is proper where a plaintiff fails to provide a causal link between FDA actions or findings, and the harm he or she allegedly suffered. *See Henderson v. Sun Pharmaceuticals Indus., Ltd.* 809 F. Supp. 2d 1373, 1379 (N.D. Ga. 2011). In *Henderson*, a plaintiff claimed he suffered personal injuries after taking two anticonvulsant drugs. *Id.* at 1375.[13] After facing dismissal for failure to state a claim, the plaintiff moved to amend, and attached his proposed pleading, while Defendants argued such amendment would be futile. *Id.* at 1376. Plaintiff alleged that after he used the subject medications, he suffered severe skin reactions: Toxic Epidermal Necrolysis ("TEN"), and Stevens–Johnson Syndrome ("SJS"). *Id.* at 1375.

The plaintiff claimed there were 1,172 reports to the World Health Organization, and 1,062 reports to FDA, where individuals suffered SJS/TEN after using the subject medications. *Id.* Plaintiff alleged that one of the defendants, Caraco, received a warning letter from FDA regarding "reports of product failures"; that an FDA inspection of Caraco's manufacturing facilities "revealed serious and systematic manufacturing compliance problems"; and that "U.S. Marshals seized $20 million of products and raw material" from Caraco. *Id.* at 1378–79. The

---

[13] The opinion in *Henderson* incorporates the factual allegations from a prior opinion rendered in the same case: *Henderson v. Sun Pharmaceuticals Indus., Ltd.*, 2011 WL 4024656, at *2 (N.D. Ga. June 9, 2011).

plaintiff claimed that another Defendant, Hospira, received an FDA letter that specifically mentioned manufacturing defects in the subject medication. *Id.*

Holding that plaintiff failed to state a claim, the *Henderson* court remarked, "although the documents Plaintiff includes in the Complaint indicate that the FDA identified manufacturing issues at Defendant Caraco's manufacturing facilities, none of the allegations are specific to [the subject medication], and none of the allegations provide a causal link between any manufacturing or design defect and SJS/TEN or any other injury plaintiff suffered." *Id.* Likewise, the plaintiff's allegations regarding Hospira failed to meet the plausibility threshold because, despite mentioning an FDA letter regarding manufacturing defects, "[p]laintiff provide[d] no allegations of a link between those defects and SJS/TEN or any of Plaintiff's injuries." *Id.* The court acknowledged that the plaintiff alleged that the subject drugs "contained impurities in the manufacturing process," but plaintiff did not "specify the impurities or allege how those impurities caused Plaintiff to develop SJS." *Id.*

Plaintiffs' allegations here are actually weaker than those in *Henderson*. There, the court recognized severe FDA actions taken in response to dangerous manufacturing and other practices. Here, FDA issued findings fairly characterized as minor, and unrelated to consumer safety. Mostly critically, despite the otherwise dangerous conditions found in *Henderson*, the court still dismissed the plaintiff's claims where the plaintiff failed to identify a sufficient causal connection between the purported FDA actions and statements, and his own injuries. More specifically, the plaintiff's allegations regarding "impurities in the manufacturing process" failed to state a claim because he did not allege a nexus between those impurities and plaintiff's injuries. Here, Plaintiffs entirely fail to identify *any* causal connection between purported filth in

Monat's products, and their "extreme hair loss" and "severe scalp irritation." The result in this case, therefore, should be no different than in *Henderson*.

Likewise, the court in *Kaufman* dismissed a plaintiff's negligence, gross negligence, strict product liability, and failure to warn claims where she failed to allege how a defendant's hormone therapy drugs caused her breast cancer. 2010 WL 9438673, at *4–5. In *Kaufman*, the plaintiff brought the above claims against a defendant pharmaceutical manufacturer, alleging that she developed breast cancer that was "hormone positive" after taking defendant's hormone therapy drugs, including Prempro and Premarin. *Id.* at *1. The plaintiff alleged that as a result of her breast cancer, she had to undergo a mastectomy and multiple revision/reconstructive surgeries. *Id.* In conclusory fashion, the plaintiff claimed her injuries were caused by Defendants' drugs. *Id.* at *3. Despite filing an amended complaint that was fifty-one pages in length, which included numerous allegations regarding the marketing of the drugs at issue, plaintiff failed to allege "the particular defect" relating to each drug, and "how the defect caused her specific type of cancer." *Id.* at *3–4. Under those circumstances, the court concluded that the plaintiff "failed to meet the *Iqbal/Twombly* pleading standard." *Id.* at *6. As in *Kaufman*, Plaintiffs claims here should be dismissed because they allege no facts demonstrating how Monat's products caused their injuries, nor do they sufficiently allege a product defect.

Sounding the death knell for Plaintiffs' claims are the existence of common sense, alternative explanations for their hair loss and scalp irritation. *See*, *infra*, at 19; *see also Twombly*, 550 U.S. at 556–57 & 567 (holding a complaint failed to state a claim of antitrust conspiracy where there was an "obvious alternative explanation" to illegality). The existence of other causal factors, for at least some of the Plaintiffs, is not merely hypothetical. In her individual complaint, filed before the initiation of this MDL, Plaintiff Amber Alabaster admitted

she has polycystic ovarian syndrome—a condition that has been linked to hair loss—and that she takes prescribed medication to treat it. *Alabaster v. Monat*, Case No. 18-cv-224 (W.D. Okla.) (ECF No. 1, ¶ 48).[14] Likewise, Plaintiff Dana Sohovich, in her individual complaint admitted she has psoriasis—a chronic skin condition resulting in symptoms like flaking, inflammation, and redness—for which she also takes prescribed medication. *Sohovich v. Monat*, Case No. 18-cv-20624 (S.D. Fla.) (ECF No. 1, ¶¶ 41, 45).

Accordingly, Plaintiffs' conclusory allegations that Monat's products cause their alleged bodily harm are not sufficient to state a cause of action.

For the same reason, Plaintiffs' claims also fail under Rule 9(b)'s heightened pleading standard, which requires that Plaintiffs allege with specificity the "who, what, when, where, and how of the allegedly false statements." *Palladium Techs., Inc.*, 2017 WL 5674733, at *2 (Gayles, J.). As stated above, Plaintiffs' FDUTPA and Consumer Claims expressly rely on alleged misrepresentations, based on the idea that Monat's products cause bodily harm. Since Plaintiffs failed to allege how Monat's products cause such harm, they have failed to allege with specificity the "how" element of the allegedly false statements. *See Simon v. Celebration Co.*, 883 So. 2d 826, 833 (Fla. 5th DCA 2004) (dismissing claim under the heightened pleading standard where plaintiff simply alleged "the conclusory statement that the representations were false," and failed to specifically allege *how* the representations were false).

*       *       *

It bears repeating that Plaintiffs assert incendiary allegations that Monat's products cause disfiguring and embarrassing bodily harm, including "extreme" hair loss and "severe" skin reactions. And, despite gathering data from hundreds of "class members," consulting the nation's

---

[14] The Court may consider public records on Defendants' Motion. *See infra*, at 8, note 2.

"preeminent" scientific experts, and having three separate attempts at pleading their claims, Plaintiffs do little more than allege in conclusory fashion that Monat's products are defective and cause injury. Although at this stage, Plaintiffs are entitled to have all plausible inferences drawn in their favor, there is no plausible inference of causation or product defect where Plaintiffs have merely alleged their use of Monat's products, subsequent injury, and the existence of online consumer complaints. Otherwise, consumers could allege a claim against virtually every consumer product manufacturer relating to almost any injury.

Plaintiffs should take notice that their allegations have real-world consequences. Backed by legal counsel, the public ascribes a level of credibility to their allegations, which severely prejudice Defendants, their employees, and the Market Partners. Despite not yet being at issue, Defendants have produced thousands of pages of scientific studies to Plaintiffs reflecting robust safety and efficacy testing, conducted by reputable third-party laboratories, unanimously and unequivocally establishing the safety and efficacy of Monat's products. Plaintiffs' should not be allowed to take repeated shots in the dark in an attempt to support their unsupportable claims of product defect and bodily harm. In light of Plaintiffs' serial failure to properly allege a product defect and causation of bodily harm—and the palpable inference drawn from that failure, specifically that Plaintiffs have no valid basis to do so given their extensive expert work and information gathering efforts—Counts I through XXV should be dismissed *with prejudice*, to the extent they rely on the existence of a product defect or causation of injury. *See Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 Fed. Appx. 925, 930 (11th Cir. 2016) (affirming dismissal of plaintiff's first amended complaint, with prejudice, where plaintiff was represented by counsel who had "ample opportunity" to state a proper claim for relief).

## II.   PLAINTIFFS LACK STANDING TO ASSERT CLAIMS FOR INJUNCTIVE RELIEF (FED. R. CIV. P. 12(b)(1))

The Supreme Court has long recognized that to establish standing to seek injunctive relief, a plaintiff must allege a threat of future harm that is not hypothetical or based on conjecture. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1271 (11th Cir. 2015).

Following established law in the Eleventh Circuit, courts in this District have dismissed putative class action claims for injunctive relief where, like here, there were no allegations asserting a threat of future injury to the named plaintiffs. *See  Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1374 (S.D. Fla. 2015) (dismissing named plaintiff's claim for injunctive relief where he could not have pled that he would again be deceived by Neutrogena's allegedly false product labels); *Marty v. Anheuser-Busch Cos.*, 43 F. Supp. 3d 1333, 1354 (S.D. Fla. 2014) (dismissing named plaintiffs' claim for injunctive relief where there were "no allegations in the Amended Complaint that plaintiffs would purchase Beck's [beer] in the future," and the "only logical inference" was that they would not do so).

Here, Plaintiffs do not allege they intend to use Monat's products in the future. [*See* ECF No. 99, ¶¶ 37–38, 225]. Rather, Plaintiffs claim Monat's products "cause embarrassing and extreme hair loss, hair breakage, head sores, infections requiring antibiotic treatment and other severe skin reactions." *Id.* ¶ 8. And, Plaintiffs claim that if they had "been aware of the defect

that existed in Monat Products . . . [they] would not have purchased Monat Products." *Id.* ¶¶ 38, 225.

Given Plaintiffs' numerous allegations concerning significant bodily harm, purportedly resulting from using Monat products (*id.* ¶¶ 8, 38–55, 124–44, 156), and their allegations that they would not purchase the products had they known about the supposed risks (*id.* ¶ 38, 225, 265, 368), it strains credulity to contend that Plaintiffs might purchase the same products in the future. As in *Marty*, the "only logical inference" here is that Plaintiffs will not do so. *See Marty*, 43 F. Supp. 3d at 1354. Moreover, Plaintiffs purport to know why Monat's advertisements were misleading—the products are allegedly unsafe, cause injury, are not FDA approved, etc. [ECF No. 99, ¶¶ 2–8, 64, 73, 161]. Since Plaintiffs claim to already know the reasons why Monat's advertisements are deceptive, there is no danger that Plaintiffs could again be deceived, even if they did purchase the products in the future. *See Dapeer*, 95 F. Supp. 3d at 1374.

Plaintiffs' allegation that, "if Defendants were to disclose the risks of use of their Products and abandon their deceptive marketing, those members of the proposed class who are currently buying and using Monat products would cease to pay the inflated prices that the Defendants' deceptive marketing enables them to charge," is likewise insufficient to confer standing to assert claims for injunctive relief. [ECF No. 99, ¶ 57]. *See Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("A named plaintiff in a class action who cannot establish the requisite case or controversy between himself and the defendants simply cannot seek relief for anyone—not for himself, and not for any other member of the class."); *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("It is not enough that the conduct of which the plaintiff complains will injure *someone*. The complaining party must also show that he is within the class of persons who will be

concretely affected."). Accordingly, Plaintiffs cannot premise their standing to seek injunctive relief on purported injuries to putative class members.

### III.   PLAINTIFFS' CLAIM FOR UNJUST ENRICHMENT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD LACK OF AN ADEQUATE LEGAL REMEDY (COUNT VIII)

"It is well settled in Florida that unjust enrichment is an equitable remedy and is, therefore, not available where there is an adequate legal remedy." *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005); *see also Bowleg v. Bowe*, 502 So.2d 71, 72 (Fla. 3d DCA 1987). Courts regularly dismiss claims for unjust enrichment where they are premised on unlawful conduct and there is an adequate remedy at law. *See Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348, 1356–57 (S.D. Fla. 2012) (dismissing plaintiff's unjust enrichment claim that was based on the "same wrongful conduct as in her FDUTPA claim"); *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1236 (S.D. Fla. 2007) (dismissing unjust enrichment claim premised on misrepresentations about product's qualities); *Martinez v. Weyerhauser Mortg. Co.*, 959 F. Supp. 1511, 1519 (S.D. Fla. 1996) (dismissing unjust enrichment claims based on allegations of wrongdoing similar to Plaintiff's TILA claim); *State of Fla. v. Tenet Healthcare Corp.*, 420 F. Supp. 1288, 1309 (S.D. Fla. 2005) (dismissing plaintiff's unjust enrichment claim premised on Defendants' "purported RICO violations and theft of outlier funds").

In support of their Unjust Enrichment claim, Plaintiffs rely entirely on allegations of Defendants' purportedly unlawful conduct, which also serve as the basis for their FDUTPA claim, Breach of Warranty claim, and state Consumer Claims. [ECF No. 68, ¶¶ 212, 309–11]; *See Guerrero*, 889 F. Supp. 2d at 1356 (dismissing plaintiff's unjust enrichment claim because, "if Defendant's sale of honey was deceptive, misleading or unlawful, causing damage to Plaintiff, she has an adequate remedy under Florida law," that is, a claim for violation of FDUTPA).

Plaintiffs' claim for unjust enrichment based on the same allegations as their FDUTPA, Breach of Warranty, and Consumer Claims consequently must be dismissed.

## IV.  PLAINTIFFS FAIL TO ALLEGE SUFFICIENT FACTS RELATING TO B&R UNDER FDUTPA AND THE STATE CONSUMER CLAIMS (FED. R. CIV. P. 9(b))

As noted above, *infra* at 10–11, Rule 9(b) requires that Plaintiffs allege their FDUTPA and state Consumer Claims with "particularity." Fed. R. Civ. P. 9(b). Under this heightened pleading standard, Plaintiffs "must allege particular facts with respect to each individual defendant's participation" in the alleged misconduct. *Viridis Corp. v. TCA Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1361 (S.D. Fla. 2015). "In other words, a plaintiff is required to set forth specific allegations as to each defendant that will fulfill the 'who, what, when, where, and how' pertaining to the underlying" misconduct. *Id.*

Plaintiffs' FDUTPA and Consumer Claims are based on statements and representations purportedly made by "Defendants." [*E.g.*, ECF No. 99, ¶¶ 2–8, 11–16]. Plaintiffs do not allege that B&R itself is involved in any aspect of the marketing of Monat's Products. *See id.* They do not allege that B&R made any statement of any kind to them, or any other consumer. *Id.* Rather, the Amended Master Complaint alleges that B&R "designs, develops, manufactures, distributes, and warehouses Defendants' hair care products." *Id.* ¶¶ 10, 25. Based on Plaintiffs' own allegations, the assertion in Counts I, and XI through XXV, that B&R *could* be involved in the allegedly actionable conduct involving marketing and statements to the public does not meet the plausibility threshold, let alone the heightened pleading standard applicable to Rule 9(b). Counts I, and XI through XXV, therefore, should be dismissed as to B&R.

V.   **SEVERAL OF PLAINTIFFS' STATE DECEPTIVE TRADE PRACTICE AND CONSUMER PROTECTION CLAIMS ARE BARRED BY APPLICABLE STATUTES OF LIMITATIONS**

Plaintiffs seek to represent classes of individuals who purchased or used Monat's products at any point in the four-year period prior to the filing of the Amended Master Complaint. [ECF No. 99, ¶¶ 198-200]. Applicable statutes of limitation, however, bar some of Plaintiffs' state Consumer Claims.

Plaintiffs aver that Defendants are estopped from relying on any statute of limitations. *Id.* ¶¶ 188–91. But estoppel does not apply. "The equitable principle of estoppel prevents a defendant whose representations or other conduct have caused a plaintiff to delay filing suit until after the running of the statutory period from asserting that bar to the action." *Sanchez v. Loffland Bros. Co*., 626 F.2d 1228, 1231 (5th Cir. 1980). A plaintiff seeking to invoke estoppel must show that the defendant's actions were "directed to the very point of obtaining the delay of which [it] seeks to take advantage." *Kazanzas v. Walt Disney World Co*., 704 F.2d 1527, 1532 (11th Cir. 1983) (citing 51 Am.Jur.2d § 438 at 904). Here, Plaintiffs do not allege Defendants made representations that were specifically directed at delaying the filing of Plaintiffs' lawsuits. *See id.*; *Sanchez*, 626 F.2d at 1231 ("to create an estoppel, the conduct of defendant must be so misleading as to cause the plaintiff's failure to file suit," for example, "active misrepresentations to the plaintiff regarding the plaintiff's legal rights," or a promise to "pay the claim or to settle if the plaintiff did not file suit.").

Plaintiffs also claim that any statute of limitations has been tolled due to purported fraudulent concealment by Defendants. [ECF No. 99, ¶¶ 180–83]. However, fraudulent concealment to toll the statute of limitations does not apply, as the Amended Master Complaint contains no allegations to support it. "Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that

-33-

concealment." *Raie v. Cheminova, Inc*., 336 F.3d 1278, 1282, n. 1 (11th Cir. 2003). Plaintiffs' bare allegations that Defendants knew of a defect but did not disclose it are insufficient to trigger this doctrine. *See*, *e.g.*, *Licul v. Volkswagen Grp. of Am., Inc*., 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013) ("allegations of Volkswagen's inaction and non-disclosure are wholly insufficient to supply the affirmative steps taken to prevent Plaintiffs from discovering the basis of their claims that would be necessary before tolling based on fraudulent concealment becomes appropriate.").

In addition, Plaintiffs' citation to the discovery rule in the Amended Master Complaint (ECF No. 99, ¶¶ 184–87) is inapposite because Defendants are not arguing that the named Plaintiffs' individual claims are untimely.

### A.      Claim Subject to a One-Year Statute of Limitations

Count XII asserting a claim for violation of the Arizona Consumer Fraud Act is subject to a one-year statute of limitations. *See Cheatham v. ADT Corp*., 161 F. Supp. 3d 815, 826 (D. Ariz. 2016). Plaintiff Colvin first asserted this claim in the Master Complaint, filed on October 1, 2018. Thus, any claim asserted by Plaintiff Colvin on behalf of the proposed Arizona Class arising before October 1, 2017 is time-barred.

### B.      Claims Subject to a Two-Year Statute of Limitations

The following claims are subject to two-year statutes of limitation: Count XI (Alaska Consumer Protection Act), Count XVIII (Iowa Private Right of Action for Consumer Fraud Act), and Count XXVI (Texas Deceptive Trade Practices – Consumer Protection Act). *See* ALASKA STAT. ANN. § 45.50.531(f); IOWA CODE ANN. § 714H.5; TEX. BUS. & COM. CODE ANN. § 17.565.

The Alaska, Iowa, and Texas claims were first raised in the Master Complaint. Thus, any claim by Plaintiffs Winter, McWhorter, and Johnston on behalf of their respective proposed State Classes arising before October 1, 2016 are time-barred.

### C.      Claims Subject to a Three-Year Statute of Limitations

The following claims are subject to a three-year statute of limitations: Count XIII (California Consumer Legal Remedies Act), Count XV (California False and Misleading Advertising Act), Count XVI (Illinois Consumer Fraud and Deceptive Business Practices Act), Count XVII (Illinois Uniform Deceptive Trade Practices Act), Count XIX (Maryland Consumer Protection Act), Count XXIV (New York General Business Law), and Count XXV (Oklahoma Consumer Protection Act). *See* CAL. CIV. CODE § 1783; *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 534 (N.D. Cal. 2012); 815 ILCS 505/10a(e); *Underground Solutions, Inc. v. Palermo*, 2014 WL 4703925, * 2 (N.D. Ill. Sept. 22, 2014); *Master Fin., Inc. v. Crowder*, 972 A.2d 864, 872 (Md. 2009); *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 14 F. Supp. 3d 99, 103 (E.D.N.Y. 2014); *Greer v. SunTrust Mortg., Inc.*, 2013 WL 5520010, at *7 (N.D. Okla. Oct. 3, 2013).

The Oklahoma claim was first raised on March 13, 2018 by Plaintiff Alabaster. *Alabaster v. Monat*, Case No. 18-cv-00224 (W.D. Okla.) [ECF No. 1]. Thus, any claim by Plaintiff Alabaster on behalf of the proposed Oklahoma Class arising before March 13, 2015 is time-barred.

The California claims were first raised by Plaintiff Botallico on April 2, 2018. *Botallico v. Monat*, Case No. 18-cv-00851 (S.D. Cal.) (ECF No. 1). Thus, any claim by Plaintiffs Botallico and Flores on behalf of the proposed California Class arising before April 2, 2015 are time-barred.

The Illinois, Maryland, and New York claims were first raised in the Master Complaint. [ECF No. 68].  Thus, any claim by Plaintiffs Shaw, Klinger-Luht, and D'Alessandro on behalf of the proposed respective State Classes arising before October 1, 2015 are time-barred.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants Monat Global Corp, Alcora Corporation, and B&R Products, Inc. respectfully request this Court dismiss Plaintiffs' First Amended Master Consolidated Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

February 4, 2019

Respectfully submitted,

/s/ William C. Meyers

William C. Meyers
David J. Chizewer
Kristen A. Jones
Joseph L. Hoolihan
GOLDBERG KOHN LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 201-4000
Facsimile: (312) 332-2196
william.meyers@goldbergkohn.com
david.chizewer@goldbergkohn.com
kristen.jones@goldbergkohn.com
joseph.hoolihan@goldbergkohn.com


-and-

Jeffrey B. Shapiro
Florida Bar No. 484113
Andrea Cox
Florida Bar No. 173495
SAUL EWING ARNSTEIN & LEHR LLP
200 S. Biscayne Blvd., Suite 3600
Miami, FL 33131
Telephone:  (305) 428-4500
jeffrey.shapiro@saul.com
andie.cox@saul.com
MIA-ctdocs@arnstein.com

***Counsel for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing and exhibits were filed with the Court using the CM/ECF filing system, which then sent notification of filing to counsel of record on this 4th day of February, 2019.

s/ William C. Meyers

William C. Meyers
GOLDBERG KOHN LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 201-4000
Facsimile: (312) 332-2196
william.meyers@goldbergkohn.com